Please call the last case of the day. The last case of the day is 5-13-0127-WC, Liquid Transport Corp. v. Workers' Compensation Commission, John Wake. Counsel, you may proceed. Before you proceed, how was Ottawa? Ottawa was very nice, Your Honor. Very nice? Did you say hello to everyone there? Very nice. The ride back was not very pleasant. Oh, I'm sorry. It was raining. And it was a little hurried, and it wasn't a scenic trip, was it? It wasn't a scenic trip, that's correct. That's my fault. And they were happy to see you, weren't they? They were happy to see me. Surprised to see me. That's probably true. Thank you, Counsel. Well, good morning. May it please the Court, my name is Bill Hardy, Counsel. I represent the appellant in this case, Employer, Liquid Transport Corp. The issues have been fully briefed, but I'd like to address two points. First, on the issue of penalties. Penalties are inappropriate in this case for several reasons. Number one, the Commission relied upon a missing witness inference, which is simply not supported by Illinois law. That's a legal issue. Number two, the Commission relied upon periods of time that were not an issue in the petition for penalties. That's a legal issue. And number three, we believe that even if the Court applies a manifest weight of the evidence standard to some portion of the penalties award, an attorney's fees award, it must be reversed because of the case law, which I think pretty clearly indicates that if you have conflicting medical opinions, an objectively reasonable basis for denying benefits, if the records are conflicting, if you have IMEs that are conflicting, it's appropriate to deny benefits. And then secondly, I would like to talk just briefly about the TTD and medical, which I believe is against the manifest weight. Let's take your last point first about the penalties. Sure. I mean, where was the reliance upon, wasn't the reliance of the respondent, the employer, on the two doctors that they cite as the reason they didn't pay it? Didn't the doctor's opinions come after about a year of denying the benefits? No, I don't think that's true at all. No, Dr. Peoples, his IME was, I believe, in February of 2009. February 15th of 2010, excuse me, February 15th of 2010. And then Dr. Sellhorst, of course, was on February the 24th of 2011. And in terms of the course of proceedings up to that point, we've laid out the medical and the treatment in pretty much in great detail in our statement of facts. You know, I understand Petitioner has presented his own statement of facts. I would ask the court to look at all the sites in the record in our statement of facts. This case involved a very minor injury. The Petitioner had a... Let me back up. I don't know if the question was answered. The commission found, let me quote this to you. Okay. Respondents' refusal to pay benefits was vexatious and unreasonable. It rejected respondents' reliance on the opinion of Peoples and Sellhorst, point two, because claimant had been attempting to obtain treatment which respondents denied for over a year before the first of those opinions was rendered. The commission specifically noted five medical providers had linked claimant's condition to the work-related accident. The first medical opinion the employer could rely on was obtained over a year later. Okay. So how do you respond to that? Well, first of all, the petition for penalties is in the appendix. And it specifically states, the petition for penalties that we responded to, that was filed shortly before trial, talks about two relevant time periods. TTD was denied beginning on April 13th of 2011. Benefits were denied starting on September 16th of 2010. That's what the petition alleges. That's what we were defending. Now, what the commission did was, the commission took the testimony of petitioner, which I submit to you is inconsistent with... Let me ask you a question before you go on to that. Sure. The petition's in the appendix, but the petition on its face states that there are attached letters, but you don't have the attached letters attached to the petition that's in the appendix. Sure. The attached letters, which I... Did those letters then show requests for payment of medical expenses over an extended period of time? The first letter that's attached, that's Exhibit A, and it's found at the record on page C110. The first letter is dated October 18th of 2010. Okay. So after September 16th, 2010. And then those letters, they're all pretty much standard form letters. It appears to be signed by Mr. Colker's secretary, and it encloses medical records, medical bills, and you'll see all of those letters, they start on October 18th. They go, there's a whole bunch of them on November 16th and 17th of 2010. In fact, most of them are in November. Almost all of them are in November. And then there's one in late December. And then February of 2011, and finally March of 2011. So the court can certainly look at those letters, but there were no demands prior to that. So I think the petition very clearly indicates that we're talking about denials after September 16th of 2010. That's what was alleged. Now, here's what happens at trial. Shortly before hearing, the petitioner's counsel, not Mr. Carraway here, but counsel at the time, sent an email to respondent's counsel demanding that the insurance adjuster, Cindy Kallsen, appear at the hearing on the day of the call, a couple of weeks later. Okay. Now, the commission has found in its decision that that was proper notice. The commission has found in its decision that she was a missing witness. Now, what happened was no deposition was taken, but there was no deposition noticed up. There are procedures for that. No subpoena was issued. The cases that are cited by the petitioner's counsel are cases where a proper subpoena or whatever was issued. But more importantly, why would the adjuster have to come to a hearing when those periods of time are not even at issue in the petition for penalties? There's a more fundamental problem with the commission's decision to apply the missing witness. One of the foundation requirements, classic, is that the witness is under the control of the party against who the inference is drawn. Mark, this was somebody who worked for an insurance company, right? That's true. So was it really under the control of the other of you? We say no. But more importantly, she wasn't a missing witness. An affidavit was prepared and petitioner's counsel stipulated to it. There was nothing raised at the hearing about a missing witness inference. There was no attempt to apply that test. What happened was, petitioner testified all these alleged denials. He said, I asked Amy Taylor, you know, back in 2008 if I could go back, and she said no, they won't authorize it, so on and so forth. Amy Taylor denies all of that. And that was by affidavit? No, that wasn't by affidavit. Amy Taylor testified. Petitioner testified that all of these treatments were denied way back in 2008. Right. And there's nothing in the records to indicate that. There's nothing in the records indicating that he tried to make an appointment, and it was denied by workers' comp, or anything like that. That's the testimony that the petitioner brought in. There's no evidence whatsoever that the petitioner ever talked to the adjuster. It's not there. And so, you know, the notion that there could be these kinds of inferences, I mean, the penalties are, the reason the court awards, or the commission awards penalties, is because of these inferences that all of these treatments were denied, and there's simply no support for it. But more importantly, it's not in the petition for penalties. So, you know, this, if there were a subpoena issued, if a notice of deposition had been issued, and for whatever, and the person didn't show up for the deposition, maybe you could make that kind of an argument. But here, we're talking about an email, and I'm not aware of any case law anywhere that would support a missing witness inference under those circumstances. I think there's a problem with the, quite frankly, with the missing witness inference anyway. But as you know, he's going to step up and say, well, even if you knock that out, there's still sufficient evidence to support the commission's decision. Well, that's, that's, that may be what he argues, and that's certainly what he argues in his brief. Oh, he's anticipating that's what he's going to argue. Yes, that is, that is what he's going to argue. But when you look at the commission's decision, which is contained on the, in the appendix, it very clearly relies upon the, and what the judge, what the commission does is, it discredits the opinions of the two doctors based on this missing witness inference. And the commission goes on to say that this guy requested medical treatment time and time again, yet that was denied, and Cindy Kallsen wasn't here, so we have to infer that she would have testified that she denied that treatment. But that's the very basis for discrediting the doctors. And as I read the commission's decision, that's the basis for the award. Well, let me just confront you with some other interpretations of the evidence. Sure. The commission rejected respondents' reliance on the opinions of Peoples and Sohorst. Peoples' opinion is the MMI was equivocal, did not have the benefit of knowing that RF treatments would provide relief. It found that Sohorst's opinion lacked substance because Sohorst examined Klayman while Klayman was experiencing relief due to an RF treatment. Further, Sohorst relied on the fact that there were various lapses in the course of treatment, but Sohorst did not know that the lapses were caused by respondents' refusal to authorize further medical visits. So was it just on the missing witness, or were there other impediments, or should we say deficiencies, that the commission found regarding Sohorst and Peoples? Well, I don't think so, because Sohorst makes it very clear in his opinion. I mean, we have to look at the context of what happened here. You know, this guy worked for two years and two months. He was taken off by the physician's assistant, Hayden. He was returned to work in January of 2011. The IME with Dr. Sellhorst takes place in February, February 24th of 2011. He performs at IME, and he specifically says in his report that he took a history and that the radio frequency did help for a short period of time, but the guy was working. He continued to work during that period of time. Then there's a stipulation that he was off work until April 11th because of an unrelated back injury, okay? So the finding, the basis for the conclusion that Dr. Sellhorst's opinions and even Dr. Peoples' opinions should be disregarded is based on a finding presented for the first time, or evidence presented for the first time at trial, that this guy was continually requesting treatment for periods of time that are not even alleged in the petition for penalties. So I think it all ties back to the missing witness efforts, and let me just go to that portion of the commission's decision so that I can respond more particularly to your question. You're talking about what page of the decision, Your Honor, were you referring to? I don't have it in front of me at the moment. Okay. Page A6 of your appendix? Yes, A6 of the appendix. All right. Second paragraph. Dr. Sellhorst's opinion lacked substance because he saw Petitioner when Petitioner was having relief from the ablations. Dr. Sellhorst questions causation due to the lapse in treatment, but apparently he did not realize the lapse was due to respondents' refusal to authorize medical visits. That wasn't even an issue at that point. The Petitioner was working at that point. There was one frequency ambulation, which he notes in his report. Dr. Sellhorst notes in his report. This discrediting of Dr. Sellhorst is based on this going back to 2008, 2009, periods of time that were not even at issue, and turning this missing witness inference into all of these findings, which are wholly unsupported by the medical records. Your Honors, if penalties are appropriate in this case, insurers and employers are in a lot of trouble in this state because this guy had a minor cut to his eyebrow. He went to the doctor. Even if you look at what he said to Dr. Marson, his own optometrist, if you look at what he said to Dr. Ansari, who he was referred to, not company doctors, he told Dr. Ansari that he had not worked for two years because of this injury. That's not true. He told Dr. Marson that he didn't have any headaches in December of 2008. This was, I see that I'm out of time, Your Honor. I will reserve the rest of my time for rebuttal. Thank you. Thank you. Good morning. May it please the Court. I'm Mr. Hardy. My name is Jason Carraway. I represent Mr. Wakeland. In the matter before the Court today, I do want to directly address the penalties, but I think the threshold issue that I want to talk about, perhaps not threshold in a way that it will determine the rest of the issues, but certainly important is what's the standard of review today? Well, we know it's manifest way. Okay. Before I lose the thought, in the course of your discussion, I think I can attempt to summarize Respondent Counsel's arguments. One is that there were problems with your requests or demands for treatment, it seems to be alleging. And secondly, the entire case stands or falls upon the missing witness inference regarding Carlson. So somewhere in your response, would you address those specific points? I'll take those right now, Justice Hudson. Prior to my office representing this gentleman, he sought treatment in 2008 and 2009. The Commission found a long line of a vexatious refusal. Based on what? What was communicated to the employer or the company? Your Honor, the arbitrator's decision specifically on page one addresses your question. The petitioner testified at trial, Your Honor, that in 2008 and 2009, after he struck his eye, he went to the IME doctors with the Midwest Occupational Op Clinic provided by Respondent. He went as Dr. Respondent's medical service? Uh-huh. And so what happened? He went there. And he said, I hit my eye. They stitched up his eye. They sent him home. Over time, the medical records clearly support the Commission's finding that this wasn't just an eye scratch case, because it's not. Even the IME doctor, Dr. Peoples, linked up a supraorbital fracture with permanent nerve damage. And those headaches began in 2009. Oh, let's assume that's true. But he's claiming, so what's the notice to the employer? How does the employer know he's seeking treatment? What's the issue there? The petitioner testified at trial, Your Honor, that when these headaches came on, he requested to go back to OCMED, and those visits were refused. When did he make that request first? Your Honor, the petitioner testified that it was before he saw Dr. Moore, which was in December of 2009. So it was way before Dr. Peoples had anything to do with this case. And actually, what did Dr. Moore do? What did the arbitrator say Dr. Moore did? And what did the Commission affirm? Dr. Moore said, you need more treatment. Go see an ophthalmologist. That's in the decision. So the petitioner was found to be credible, specifically in the arbitrator's decision on that testimony, Your Honor. And the employer knew this? Of course. When did he request of the employer the first time that he be allowed to go for additional treatment, subsequent to Moore's testimony, Your Honor? Moore's diagnosis? Was the first date he actually requested from the employer that he be allowed to go for additional treatment? Justice Hoffman, I'm not sure the record is that specific, but I can tell you for certain it was before October 6, 2009, after Dr. Moore referred him to Dr. Marson, which is on page one of the decision adopted by the Commission. I mean, did he testify to that somewhere in the record? Yes, he testified that he tried to go back to the company doctor at Midwest Ock. However, the employer refused the appointment. And then after that, he saw Dr. Moore in December of 2009, and saw Dr. Marson in October 6, 2009. So there is testimony in this record outside of this missing witness rule. Further, what did Dr. Peoples say? Dr. Peoples, a year after all of this treatment and these refusals comes in and links it up. He comes in and says, no, he's had these headaches this whole time. That's their doctor. And then after that opinion, my client tries to go and seek treatment with four of the doctors who he gets through group. All of those doctors link it up. And then they get a second IME. And do you know what the second IME says? None of this stuff that happened before me is true. This petitioner was at MMI a week after the accident. That's in direct contradiction to their first IME. So there's plenty of credible evidence in this record. If we're going to use manifest weight on the penalties. The real question is, when did they get these IME opinions in relation to the point in time when your client requested medical treatment and was refused? The arbitrator found that he requested the treatment in November of 2008, that he attempted to get it. The Peoples opinion didn't come until February of 2010. And what about the second IME? When did that come? March 2011. And they couldn't have relied upon the Peoples opinion or the 2011 opinion to refuse medical treatment in November of 2008? Correct. So now the question is, what was the basis for the refusal in 2008? There was no good reason for the refusal in 2008. They had sent him to their own Occ Med clinic who had linked it up. And then they refused the treatment. And they refused the treatment because they thought it was an eye scratch. So he sought treatment at the place where the company directed him to. Correct. And if you read this decision, there are all this treatment after Peoples and between Selhurst. And those four or five doctors, a pain manager special, a board certified neurologist, all said he needed treatment, which they continued to refuse. If this is a credibility contest, if credibility is in the mix, and the proper standard of review is against the manifest way of the evidence, I don't need a single sentence of this missing witness rule to win this case. It's there already. Why? Because everybody believed the petitioner. It's one of those cases. My guy presented it and was credible. This isn't a Pandora's box either. Well, yeah, nobody disputes that he went to the company facility, right? The company clinic, and it was directed there. Correct. This isn't Pandora's box. By affirming these penalties, you don't open that door. Don't go down that slippery slope. What happened in this case was the employer pushed treatment. The treatment wasn't the way they wanted it to go. They stuck their head in the sand. And my guy finally got an attorney. And then what happened is they tried to backdate IME opinions to cover themselves. Where do you have that from? There wasn't a single IME, Justice Hudson, during the beginning of this case. They got Dr. Peoples only after they had been on this year-long track of refusals. Then they got Peoples. What do you mean backdate? That was the issue. Sure. It's poor language. They obtained an IME. Correct. And it's poor language. But what I mean by the statement was, then they went back to the barrel to get a second opinion. With Selhorst. You mean after the fact, as opposed to backdated? Yes. I apologize for the misstatement. You say backdated, that conjures up all sorts of nefarious ideas. And I don't think anything nefarious is going on here. But what I do know is, when you have a second dip in the barrel to get another IME, and your first IME is causally connected, and your second IME says never happened, that's grounds for penalties. It's vexatious. It's unreasonable. Don't think this is just an eye scratch case either. That really doesn't matter for us. But this is a serious injury. What were his injuries? He ended up having a superorbital nerve injury. He continues to get injections into his head every three months. He was taking 15 to 20 aspirin a day to try and get through this when the treatment was being refused. These are serious injuries. This is not... The respondent just can't justify that. Missing witness rule? Justice Hudson, I understand. I understand what you're saying. I would, however, like just to point out that that adjuster certainly wasn't somebody we had access to. I can't call their adjuster when they're represented by counsel. I know, but how... Why is it really under his control? I mean, you can see the issue there. I can. He's not an employee of his business. I can, and I don't know what contract exists between the law firm and that insurance company. You're right, Justice Hudson. I don't. You mean you can't subpoena adjustments? I could have. I could have. Okay, so there is mechanisms. There is mechanisms, but we also sent a warning. We sent an email before trial. Nobody says we noticed this up improperly. The case was perfectly noticed up for trial. We send an email that says, because we know what our guy's going to testify to. He's going to testify to the fact that he asked for all this treatment. We wanted the adjuster there. We told them to bring the adjuster. They said no. Then they supplied an affidavit, which the arbitrator didn't find to be credible, and neither did the commission, and the penalties were awarded. This is a manifest way the evidence review from top to bottom. All of the other elements are met. Causal connection, TTD. The penalties, by the way, are calculated correctly. Now, the 16 and the 19K are just statutory. They're a percentage of TTD and medical. I don't need to talk about those, but the respondent would like to say that the L penalties are in excess. They're not. It's a cap of $10,000. If you take our petition that we talked about earlier, and Justice Hoffman and Mr. Hardy talked about earlier, look at the date. It's September 16, 2010. It blows the cap that way, too. So it doesn't matter if we go back to 2008 and 2009 to find vexatious, but you should, because even our petition for penalties exceeds the cap of the penalties that were awarded. For all these reasons, Your Honors, I ask you to affirm this decision in its entirety. Send it back down. We'll have another trial on permanency, and we'll finish this. Thank you. Thank you, counsel. Thank you, Your Honors. This is not manifest weight. We're talking about legal issues here, the missing witness instruction. We are talking about a legal issue when you look at the petition for penalties, and it doesn't say anything about 2008, 2009. It's an evidentiary ruling, right? It's an evidentiary. Don't we review evidentiary rulings on abuse of discretion generally? When the petition for penalties alleges that there's no TTD since April 13, 2011, and a denial of benefits unjustifiably subsequent to September 16, 2010, those are the issues in the penalties. Those are the issues. This summary of Mr. Wakeland's testimony, that is what he testified to. But Dr. Marcin, his optometrist, he saw him in December of 2008, and he had no problem. He wasn't complaining of any headaches. There is nothing in those records that established that he had all these problems. He was continuing to work. We're talking about— He didn't see five medical providers? That's not accurate? He saw—well, the timeline is he saw Dr. Moore. Dr. Moore found no problems with him. I mean, it healed up. He went back to work. There were no complaints in any of the records until Dr. Marcin sends a letter in October of 2008, and then the employer actually sends him back. Pays for it. There's a CT scan that's performed. That's paid for. Sends him to see Dr. Peoples. That's paid for. Pays for all of the visits with Dr. Moore. There's no question that all of the treatment up until he went to see the physician's assistant was paid for, and there were no denials of treatment, and there were no allegations of that in the petition. What they've done here is they have taken this missing witness instruction, this inference based on an affidavit to say, well, these doctors' opinions are totally not credible. Well, your honors, in this case, if you look at the records, this guy continued to work during that entire period of time. Even the records from Dr. Marcin don't support what he's saying. He's saying that he's had these headaches from day one. They were at 5, 6, 7, 8 out of 10, yet his own statements to his own doctors don't support that. Well, the commission yet believed him, right? Well, the commission believed him, or, well, the commission issued the penalties based on the missing witness instruction. The commission... Your honor, he testified that he testified before the arbitrator all of these things that happened to him, his pain, his litany of treatments. The commission, obviously, the arbitrator believed him, did they not? Well... I mean, he wouldn't be here if they did. Well, yes... He wouldn't be here, maybe. Yes, but the petition for penalties wasn't based on any of those periods. The petition for penalties had nothing to do with those periods. The petition for penalties alleges that they denied treatment after September of 2016, and they denied TTD after, I mean, September of 2011, or 2010, and then April of 2011 for TTD. And then they go back to all of this testimony that's not even supported in the medical records and make a finding that Dr. Salhorst, in his opinion, is fully supported by the records. To say that that's not a reasonable basis when you've got two IME doctors who basically say he's an MMI, you've got all these gaps in treatment, the employer paid all these bills up to that point. The bills that were an issue in the penalties were all submitted in the fall of 2011, or 2010. And then we had an IME, the doctor says, look, this is a relatively minor injury, and it was. There's certainly a reasonable basis for it. The case law says if there's conflicting medical opinions, there's conflicting medical in the very records. There's conflicting medical testimony because we have two competent IME doctors, and the only reason that they're discredited is because of this missing witness instruction. This is not a penalties case. It shouldn't be a penalties case. If penalties are appropriate here, your honors, I don't want to practice worker's comp anymore and ever defend an insurer or an employer because this is a case where the insurer did everything right, paid everything, up until the point where IME showed this guy had recovered. He worked for two years and two months without any problems. Thank you, your honors. Thank you, counsel, both, for your arguments in this matter this morning. It will be taken under advisement. A written disposition will issue. The court will stand in recess until 9 a.m. tomorrow morning.